No. 07-1384

_____

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

_____

SECURITIES AND EXCHANGE COMMISSION,
Plaintiff-Appellant,

v.

JAMES TAMBONE; ROBERT HUSSEY,
Defendants-Appellees.

_____

On Appeal from the United States District Court
for the District of Massachusetts

_____

ROBERT HUSSEY'S PETITION FOR
PANEL REHEARING AND REHEARING *EN BANC*

_____

| | |
|---|---|
| Warren L. Feldman<br>Skadden, Arps, Slate,<br>  Meagher & Flom LLP<br>Four Times Square<br>New York, NY 10036<br>Tel.: (212) 735-2420<br><br>Frank A. Libby, Jr.<br>John J. Commisso<br>LibbyHoopes, P.C.<br>175 Federal Street<br>Boston, MA 02110<br>Tel.: (617) 338-9300 | Christopher M. Joralemon<br>Clifford Chance US LLP<br>31 West 52nd Street<br>New York, NY 10019<br>Tel.: (212) 878-8581 |

*Counsel for Robert Hussey*

NYA914799.1

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................ ii

PRELIMINARY STATEMENT ..........................................................................1

STATEMENT OF THE CASE ............................................................................2

ARGUMENT .......................................................................................................3

I. THE MAJORITY OPINION CONFLICTS WITH THE
SUPREME COURT'S DECISION IN *CENTRAL BANK* AND
AUTHORITATIVE DECISIONS BY OTHER COURTS OF
APPEALS CONCERNING THE SCOPE OF LIABILITY UNDER
SECTION 10(B) OF THE EXCHANGE ACT ............................................3

    A. *Central Bank* and its Progeny Require that a Defendant
Actually Make the Misstatement at Issue to be Held Liable
Under Section 10(b) and Rule 10b-5 ....................................................4

    B. The Unprecedented "Implied Representation" Theory
Adopted by the Majority Opinion Would Create Widespread
Confusion and Uncertainty in Securities Markets ...............................7

II. THE MAJORITY OPINION'S UNILATERAL EXPANSION OF
PRIMARY LIABILITY UNDER SECTION 17(A) OF THE
SECURITIES ACT CONTRADICTS PRIOR DECISIONS
AND DISREGARDS SUPREME COURT GUIDANCE ..........................10

    A. Section 17(a) and Section 10(b) Prohibit the Same
Fraudulent Acts ..................................................................................11

    B. The Majority Opinion Eliminates the Distinction between
Primary and Secondary Conduct Under Section 17(a) in
Contravention of *Central Bank* ........................................................13

CONCLUSION...................................................................................................14

# **TABLE OF AUTHORITIES**

## **CASES**

*Anixter v. Home-Stake Prod. Co.*,
   77 F.3d 1215 (10th Cir. 1996)..............................................................................5

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
   511 U.S. 164 (1994)..................................................................................*passim*

*In re Charter Commc'ns, Inc. Sec. Litig.*,
   443 F.3d 987 (8th Cir. 2006), *aff'd sub nom. Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761 (2008) .....................................................5

*Maggio v. Gerard Freezer & Ice Co.*,
   824 F.2d 123, 128 (1st Cir. 1987) .......................................................................14

*SEC v. KPMG LLP*,
   412 F. Supp. 2d 349 (S.D.N.Y. 2006) ..................................................................7

*SEC v. Lucent Techs., Inc.*,
   363 F. Supp. 2d 708 (D.N.J. 2005) ................................................................7, 12

*SEC v. Monarch Funding Corp.*,
   192 F.3d 295 (2d Cir. 1999)................................................................................12

*SEC v. Rocklage*,
   470 F.3d 1 (1st Cir. 2006) ..................................................................................12

*SEC v. Tambone*, *("Tambone I")*
   417 F. Supp. 2d 127 (D. Mass. 2006) ..................................................................2

*SEC v. Tambone*, *("Tambone II")*
   473 F. Supp. 2d 162 (D. Mass. 2006) ..................................................................3

*SEC v. Texas Gulf Sulfur Co.*,
   401 F.2d 833 (2d Cir. 1968) ...............................................................................11

*Teamsters v. Superline Trans. Co.*,
   953 F.2d 17 (1st Cir. 1992).................................................................................8

NYA914799.1

*United States v. Persky*,
    520 F.2d 283 (2d Cir. 1975) ............................................................................... 11

*United States v. Slade*,
    980 F.2d 27 (1st Cir. 1992) ................................................................................. 8

*Wright v. Ernst & Young LLP*,
    152 F.3d 169  (2d Cir. 1998) ........................................................................... 5, 6

*Ziemba v. Cascade Int'l, Inc.*,
    256 F.3d 1194 (11th Cir. 2001) .......................................................................... 5

## STATUTES

15 U.S.C. § 78j(b) ..................................................................................................... 4

15 U.S.C. § 78t(e) ..................................................................................................... 7

NYA914799.1

Pursuant to Rules 35 and 40 of the Federal Rules of Appellate Procedure, Defendant-Appellee Robert Hussey petitions the Court for a panel rehearing and for a rehearing *en banc* in this matter following the December 3, 2008 decision (the "Majority Opinion") from which Judge Selya dissented in significant part.[1]

## PRELIMINARY STATEMENT

The Majority Opinion conflicts with the decision of the United States Supreme Court in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), which identifies the limits of actionable conduct in securities fraud cases. As Judge Selya admonishes, the Majority Opinion represents nothing less than "judicial enlargement of the scope of primary liability for violations of the antifraud provisions of the securities laws" that "stretches the concept of primary liability beyond what … the Supreme Court would countenance." (Selya Op. at 95.) This "radical departure" is "an unwarranted usurpation of legislative and administrative authority" that "flies in the teeth of the Supreme Court's circumspect vision." (Selya Op. at 95, 97.)

This matter presents questions of exceptional importance, as the Majority Opinion—beyond its failure to heed the Supreme Court— also conflicts with

---

[1] References to the Majority Opinion are indicated as "(Slip Op. at __)," while citations to Judge Selya's dissenting opinion are identified as "(Selya Op. at __)."

authoritative decisions of other United States Courts of Appeals that have addressed the proper scope of liability under the securities law antifraud provisions. While Judge Selya concludes that these other Circuit Courts "ha[ve] gotten it exactly right," the Majority Opinion "relegates these sensible precedents to the scrap heap." (Selya Op. at 100-01.)

Ultimately, the Majority's unprecedented efforts to rewrite the federal securities laws—left uncorrected—"will cause confusion in an industry much in need of clarity" (Selya Op. at 105), and resuscitate the very threats to the securities markets extinguished by the Supreme Court in *Central Bank*.

## STATEMENT OF THE CASE

The Securities and Exchange Commission (the "SEC") filed its initial complaint in this matter on February 9, 2005. The SEC claims that Mr. Hussey ran afoul of securities laws in his role as a sales executive for a mutual fund distributor by allowing certain investors to engage in "market timing" activities contrary to language in fund prospectuses that suggested a resistance to such practices.

On January 27, 2006, the district court dismissed the SEC's complaint. *See SEC v. Tambone*, 417 F. Supp. 2d 127, 134 (D. Mass. 2006) ("*Tambone I*") ("In essence, the SEC has not alleged that [Mr. Hussey] made any untrue or

misleading statement of material fact. The SEC's … legal argument is incapable of being reconciled with [previous decisions].").

Following a series of procedural missteps by the SEC arising out of its failure to recognize the district court's dismissal as a "final judgment" under First Circuit law, the SEC instituted a new action against Mr. Hussey by filing a complaint virtually identical to its dismissed initial complaint. On December 29, 2006, the district court once again dismissed the SEC's claims against Mr. Hussey. *See SEC v. Tambone*, 473 F. Supp. 2d 162, 167 (D. Mass. 2006) ("*Tambone II*") (finding that SEC had failed to articulate actionable primary violations under well settled law, and noting that attempt to attribute alleged misstatements to Mr. Hussey revealed that SEC was "merely guessing" as to whether he played any role in drafting prospectus language in question).

On December 3, 2008, this Court reversed the district court's judgment dismissing the SEC's action.

## ARGUMENT

I. **THE MAJORITY OPINION CONFLICTS WITH THE SUPREME COURT'S DECISION IN *CENTRAL BANK* AND AUTHORITATIVE DECISIONS BY OTHER COURTS OF APPEALS CONCERNING THE SCOPE OF LIABILITY UNDER SECTION 10(B) OF THE EXCHANGE ACT**

Fifteen years ago, the United States Supreme Court defined the scope of conduct constituting a primary violation under the general antifraud provision of

the Securities Exchange Act of 1934. *See Central Bank*, 511 U.S. at 164 (holding that Section 10(b) and Rule 10b-5 do not impose secondary liability for misconduct of others). The Majority Opinion—as stressed by Judge Selya in his dissent—represents nothing less than a "radical departure" from this established precedent that "stretches the concept of primary liability beyond what … the Supreme Court would countenance and allows the SEC to cast a wider net than any court has ever thought possible." (Selya Op. at 95.)

> A. *Central Bank* and its Progeny Require that a Defendant Actually Make the Misstatement at Issue to be Held Liable Under Section 10(b) and Rule 10b-5

This is a "misstatement" case. Specifically, the SEC seeks to hold Mr. Hussey liable under Section 10(b) for alleged misstatements in mutual fund prospectuses.[2] The Majority Opinion, however, misapprehends the basic—and fatal—flaw in the SEC's case: Mr. Hussey did not actually *make* any of the statements in question.

---

[2] Section 10(b) makes it unlawful "to use or employ, in connection with the purchase or sale of any security … any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe …." 15 U.S.C. § 78j(b). The Majority Opinion properly limits the discussion to sub-section (b) of Rule 10b-5, which makes it unlawful "to make any untrue statement of a material fact." (Slip Op. at 46-47) (noting that SEC did not appeal the district court's dismissal of claims under sub-sections (a) and (c) of Rule 10b-5, which address the use of fraudulent practices, schemes, devices or courses of business).

4

In *Central Bank*, the Supreme Court explained that Section 10(b) "prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act." *See* 511 U.S. at 177-78 ("We cannot amend the statute to create liability for acts that are not themselves manipulative or deceptive within the meaning of the statute.").

Following the Supreme Court's guidance, an overwhelming majority of Circuit Courts of Appeals to consider the issue have ruled that a defendant in a securities fraud case must actually *make* the alleged misrepresentation at issue for primary liability to attach. *See, e.g., In re Charter Commc'ns, Inc. Sec. Litig.*, 443 F.3d 987, 992 (8th Cir. 2006) ("[A]ny defendant who does not make or affirmatively cause to be made a fraudulent statement or omission … is at most guilty of aiding and abetting and cannot be held liable under Section 10(b) or any subpart of Rule 10b-5."), *aff'd sub nom. Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761 (2008); *Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998) ("If *Central Bank* is to have any real meaning, a defendant must actually make a false or misleading statement in order to be held liable under Section 10(b).") (citation omitted); *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194 (11th Cir. 2001); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1226 (10th Cir. 1996) ("Reading the language of § 10(b) and 10b-5 through the lens of *Central Bank of Denver*, we conclude that in order for

[defendants] to 'use or employ' a 'deception' actionable under the antifraud law, they must themselves make a false or misleading statement.").

As observed by Judge Selya, the Majority Opinion "effectively relegates these sensible precedents to the scrap heap – and it does so without any meaningful support in the case law." (Selya Op. at 100-01.)  The Majority defends this extraordinary step by suggesting that *Central Bank* and the authoritative Circuit Court decisions that follow it are inapposite because they involve Section 10(b) claims brought by a private plaintiff.  (Slip Op. at 64) (concluding that *Central Bank* "was primarily a manifestation of the Court's desire to limit the scope of the judicially-implied private cause of action under Rule 10b-5").  For example, the Majority Opinion makes much of the fact that a few of the Circuit Court decisions, in addition to requiring a misstatement by the defendant, also require a plaintiff to demonstrate that such misstatement was *publicly* attributed to the defendant at the time of dissemination in order to satisfy the "reliance" element of a Section 10(b) private cause of action.  *Accord Wright*, 152 F.3d at 175.

With all due respect to the Court, the issue of reliance is irrelevant here.  As Judge Selya explains, the "absence of any need to prove reliance …. does not give the SEC carte blanche to punish under a primary liability framework those whose conduct is not proscribed by the language of the relevant statute or rule."

(Selya Op. at 103.) In short, irrespective of reliance, the SEC still must prove that Mr. Hussey actually made the misstatement at issue.

In focusing on the distinction between the SEC and a private plaintiff, the Majority appears to misapprehend the basis of the Supreme Court's ruling in *Central Bank*. Specifically, the Supreme Court relied solely on the text of the statute—not the plaintiff's identity—to define the scope of conduct that constitutes a primary violation of Section 10(b). *See* 511 U.S. at 178 (concluding that "the statute itself resolves the case").[3]

> B.   The Unprecedented "Implied Representation" Theory Adopted by the Majority Opinion Would Create Widespread Confusion and Uncertainty in Securities Markets

The Majority Opinion engages in further "judicial adventurism" (Selya Op. at 103) by adopting an unprecedented "implied representation" theory of Section 10(b) liability that—if allowed to stand—would wreak havoc on the securities markets by exposing secondary actors to liability for the misconduct

---

[3]   While the Commission is now authorized to bring enforcement actions for aiding and abetting, Congress did not change the text of Section 10(b) in granting such authority. *See* 15 U.S.C. § 78t(e). *Central Bank* continues to govern all actions—including those brought by the SEC—that seek to establish primary liability under Section 10(b). *See, e.g., SEC v. KPMG LLP*, 412 F. Supp. 2d 349, 372 (S.D.N.Y. 2006) (explaining that *Central Bank* test distinguishing primary vs. secondary liability applicable to SEC enforcement actions); *SEC v. Lucent Technologies Inc.* 363 F. Supp. 2d at 724 (requiring SEC to establish that defendant made challenged statement).

of others.  The Majority's extraordinary pronouncement "has the potential to cause a great deal of mischief," and "will garble the law and cause confusion in an industry much in need of clarity."  (Selya Op. at 105.)

Despite filing multiple briefs with the district court over the course of two years in opposition to four different motions to dismiss its claims, the SEC raised its "implied representation" argument *for the first time* on appeal in a desperate eleventh-hour attempt to come up with an actionable theory of primary liability.[4]  Remarkably, the Majority Opinion embraces the SEC's novel theory, which grafts on to the prospectus statements made by others a derivative "implied representation" by Mr. Hussey that such statements were "truthful and complete."  (Slip Op. at 42-43.)  According to the Majority Opinion, this unspoken meta-misstatement springs from Mr. Hussey's "central role" in the securities markets (*i.e.*, his status as an "underwriter" employee).

---

[4]     Apparently, the Majority opted not to honor the fundamental rule in this Circuit that prohibits a party from raising new legal theories on appeal.  *See, e.g., United States v. Slade*, 980 F.2d 27, 30 (1st Cir. 1992) ("It is a bedrock rule that when a party has not presented an argument to the district court, she may not unveil it in the court of appeals."); *Teamsters v. Superline Trans. Co.*, 953 F.2d 17, 21 (1st Cir. 1992) ("If any principle is settled in this circuit, it is that, absent the most extraordinary circumstances, legal theories not raised squarely in the lower court cannot be broached for the first time on appeal.").

This "path-breaking step, though taken in the guise of an interpretation of Rule 10b-5, involves nothing less than a rewriting of that rule." (Selya Op. at 95.) Once again, Judge Selya exposes the flaws in the Majority's approach:

> The SEC charges these defendants, in substance, with passing along to brokers, dealers, and customers prospectuses containing false statements of material fact created by others. To stretch the word "make" to cover that conduct, so that an underwriter's status as such renders him per se liable for others' statements, requires a freewheeling interpretation that disregards both plain meaning and orthodox definitions. There is no principled justification for such an interpretation; in the last analysis, it amounts to a thinly-disguised attempt to rewrite the rule.

(Selya Op. at 97-98.)[5]

The Majority continues to ignore *Central Bank's* teachings in adopting this extraordinary approach. Specifically, the Supreme Court instructed that a defendant's *conduct*—not his role in the securities markets—determines whether he can be held liable under Section 10(b). *See* 511 U.S. at 177, 191 (noting that a lawyer, accountant or bank could be held liable as a primary violator, but only for employing a manipulative device or making a material misstatement).

---

[5] Given that the Majority Opinion further relies upon the substance of its implied representation theory to conclude that the complaint satisfies the "substantial assistance" element of the SEC's aiding and abetting claims (Slip Op. at 84-85), Mr. Hussey respectfully submits that the Court should revisit the disposition of those claims as well.

In taking this "forbidden" step "beyond the court's legitimate authority" (Selya Op. at 98, 105), the Majority Opinion throws open the floodgates to SEC enforcement actions *and private lawsuits* in which secondary actors who play any "central role" in the securities markets—*e.g.*, auditors, lawyers, investment bankers, financial advisors—will be cast as primary violators based on their "implied blessings" of others' alleged misstatements. In essence, the Majority Opinion will create precisely the scenario that the Supreme Court sought to foreclose in *Central Bank*. *See* 511 U.S. at 188 (warning that uncertainty and excessive litigation spawned by claims against secondary actors ultimately would "disserve the goals of fair dealing and efficiency in the securities markets").

## II. THE MAJORITY OPINION'S UNILATERAL EXPANSION OF PRIMARY LIABILITY UNDER SECTION 17(A) OF THE SECURITIES ACT CONTRADICTS PRIOR DECISIONS AND DISREGARDS SUPREME COURT GUIDANCE

The Majority Opinion further erases the carefully crafted limits of primary liability under the federal securities laws by adopting an unsupported interpretation of Section 17(a) of the Securities Act of 1933. Specifically, the Majority Opinion concludes that "the scope of conduct encompassed by" the misstatement prohibition in Section 17(a)(2) "may, in certain circumstances, be broader than" Section 10(b) and Rule 10b-5(b). No other court ever has reached

such a conclusion in the history of jurisprudence applying the statute. This complete absence of support should be expected, as the Majority Opinion's expansion of Section 17(a) conflicts with any reasonable reading of the provision and once again flies in the face of the Supreme Court's *Central Bank* guidance.[6]

### A.     Section 17(a) and Section 10(b) Prohibit the Same Fraudulent Acts

As the Majority Opinion recognizes, the text of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act confirms their common purpose of prohibiting fraudulent behavior in the securities markets. (Slip Op. at 25-26.) Indeed, the language describing the scope of conduct prohibited by Section 10(b) and Rule 10b-5 essentially parrots Section 17(a), which served as the model for those provisions. *See, e.g., United States v. Persky*, 520 F.2d 283, 287 (2d Cir. 1975).

Importantly, although the specific *acts* prohibited by these sibling sections are identical, courts long have recognized that Section 17(a) serves a *more limited* corrective function, thus justifying the need for two separate provisions. *See SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 867 (2d Cir. 1968) (Friendly,

---

[6]     Judge Selya declined to join in the portion of the Majority Opinion discussing the scope of Section 17(a) based on his "concern[] that the language in which the majority couches this holding is overly broad." (Selya Op. at 95.)

J., concurring) ("[T]here is unanimity … that § 17(a)(2) of the 1933 Act—indeed the whole of § 17—was intended only to afford a basis for injunctive relief and, on a proper showing, for criminal liability ….").[7] While explicitly acknowledging this distinction, the Majority Opinion turns Judge Friendly's observation on its head by illogically concluding that the SEC intended to *narrow* the scope of prohibited conduct under Section 10(b) by adopting the phrase "to make any untrue statement" in Rule 10b-5 from Section 17(a)'s "by means of any untrue statement" language. (Slip Op. at 41.)

The Majority Opinion stands alone in drawing such a distinction between Section 17(a) and Section 10(b), as courts—including this one—long have treated the provisions as prohibiting the same universe of conduct. *See, e.g., SEC v. Rocklage*, 470 F.3d 1, 4 n.1 (1st Cir. 2006); *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999).[8] This is not surprising, as it would be

---

[7] The two sections also differ slightly in their respective "triggering transactions." Section 17(a) applies to all securities "offers or sales," while Section 10(b) applies to all securities "purchases or sales."

[8] The Majority Opinion cites the inclusion of the phrase "directly or indirectly" as a justification for its unparalleled expansion of Section 17(a). (Slip Op. at 42.) The Supreme Court in *Central Bank*, however, already has discredited this reading of the phrase. *See* 511 U.S. at 175-76 (rejecting SEC's "novel argument" that phrase "directly or indirectly" in text of Rule 10b-5 should be read broadly to cover acts that merely aid and abet prohibited conduct). *Accord SEC v. Lucent Techs.*, 363 F. Supp. 2d at 721-24 (denying SEC argument that defendant can "indirectly" make statement by another).

anomalous to suggest—as the Majority does—that a fraudulent act is prohibited by one of these provisions but not the other.

> B. The Majority Opinion Eliminates the Distinction between Primary and Secondary Conduct Under Section 17(a) in Contravention of *Central Bank*

As with its "implied representation" theory under Section 10(b), the Majority Opinion's judicial enlargement of Section 17(a) blurs the line between actionable primary violations and mere aiding and abetting conduct not prohibited by the statute. Following the Majority Opinion's rationale, any secondary actor in the securities markets whose compensation relates in any way to a securities offering can be held liable as a primary violator under Section 17(a) based on another party's misstatement. (Slip Op. at 46) (concluding that Mr. Hussey "obtained money by means of an untrue statement" in satisfaction of Section 17(a)(2) because a portion of his compensation was based on commissions earned from sales of mutual funds marketed with prospectuses containing allegedly false statements by others).

For example, under the Majority Opinion's expansive interpretation of Section 17(a), an accounting firm compensated for services provided in connection with a company's stock issuance would face potential liability if the offering materials contained false information – even if the accountants had nothing to do with the alleged misstatement. This same threat would exist for

13

any other secondary market actor involved in the sale of securities, and raises the specter of the very dangers that the Supreme Court warned against in *Central Bank*. *See* 511 U.S. at 188 (cautioning that any uncertainty surrounding the rules for establishing primary liability in "an area that demands certainty and predictability" will "lead[] to the undesirable result of decisions made on an *ad hoc* basis, offering little predictive value to those who provide services to participants in the securities business").[9]

## **CONCLUSION**

In what Judge Selya aptly describes as a "radical departure" representing "an unwarranted usurpation of legislative and administrative authority," the Majority Opinion attempts to enlarge the scope of liability under the antifraud provisions of the securities laws in direct contravention of the Supreme Court's decision in *Central Bank* and authoritative decisions by other Circuit Courts. Robert Hussey respectfully requests that the Court reconsider these

———————————

[9] The Majority Opinion also misapprehends both the law and the facts concerning the SEC's efforts to rescue its time-barred claims through "equitable tolling," thus warranting rehearing on this issue as well. In short, the SEC was on notice regarding the challenged conduct for years, and forfeited its tolling request by failing to exercise any diligence. *See, e.g., Maggio v. Gerard Freezer & Ice Co.*, 824 F.2d 123, 128 (1st Cir. 1987).

exceptionally important issues by granting this petition for a panel rehearing or a rehearing *en banc*.

Dated: January 16, 2009

        Respectfully submitted,

        ROBERT HUSSEY,

        By his attorneys,

        /s/ Christopher M. Joralemon
        _____
        Christopher M. Joralemon
        Clifford Chance US LLP
        31 West 52nd Street
        New York, NY 10019
        Tel.: (212) 878-8000

        Warren L. Feldman
        Skadden, Arps, Slate,
          Meagher & Flom LLP
        Four Times Square
        New York, NY 10036
        Tel.: (212) 735-2420

        Frank A. Libby, Jr.
        John J. Commisso
        LibbyHoopes, P.C.
        175 Federal Street
        Boston, MA 02110
        Tel.: (617) 338-9300

## **CERTIFICATE OF SERVICE**

      I hereby certify that on this 16th day of January, 2009, I caused two true and correct copies of Appellee Robert Hussey's Petition for Panel Rehearing and Rehearing En Banc to be served via Federal Express on the following parties:

Andrew N. Vollmer, Esq.
Jacob H. Stillman, Esq.
John W. Avery, Esq.
Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549-9010

A. John Pappalardo, Esq.
John A. Sten, Esq.
David G. Thomas, Esq.
D. Greg Blankinship, Esq.
Greenberg Traurig, LLP
One International Place
Boston, MA 02110

      /s/ John J. Commisso
      _____
      John J. Commisso

      *Counsel for Robert Hussey*

Dated:  January 16, 2009